**TYLER REFRIGERATION CORPORATION, Plaintiff,**

v.

**KYSOR INDUSTRIAL CORPORATION, Defendant.**

**Civ. A. No. 79–497–JLL.**

United States District Court, D. Delaware.

Jan. 17, 1985.

William T. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Robert E. LeBlanc, Charles Boukus and Henry Shur of LeBlanc, Nolan, Shur & Nies, Arlington, Va., of counsel, for plaintiff.

Steven J. Rothschild, Edward P. Welch and Stephen E. Jenkins of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., Richard C. Cooper and Randall G. Litton of Price, Heneveld, Huizenga & Cooper, Grand Rapids, Mich., and David W. Crooks, Vice President and Gen. Counsel of Kysor Industrial, Cadillac, Mich., of counsel, for defendant.

## OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

This is a patent infringement suit in which the plaintiff and defendant each contends that the other infringes its patent or patents.[1] The complaint, originally filed by Tyler Refrigeration Corporation ("Tyler") against Kysor Industrial Corporation ("Kysor"), as supplemented, alleges Kysor's infringement of claims in Tyler's Subera et al. U.S. Patents Nos. 4,140,720, 4,207,747 and 4,283,922 (collectively called "the Subera patents" or " '720, '747 or '922 patents").[2] (Docket Item ["D.I."] 72.) Kysor,

1. Jurisdiction exists by virtue of 28 U.S.C. § 1338(a) and venue is properly laid under 28 U.S.C. § 1400(b). (D.I. 290 at 4.)

2. The '747 and '922 patents are divisions of the '720 patent and have identical drawings and specifications but different claims. By reason of terminal disclaimers all these patents expire

on the same date as the '720 patent. Tyler asserts that Kysor infringes claims 35 and 36 of the '720 patent, claims 1–3 of the '747 patent, and claims 1–12 of the '922 patent. (D.I. 290, III, ¶ 4.)

in its answer to Tyler's supplemented complaint, included an amended counterclaim, alleging that all three Tyler patents are invalid and not infringed and that they are unenforceable because of fraud practiced in their procurement. (D.I. 77.) In addition, Kysor alleges that Tyler infringes claims 3 and 6 of its U.S. Patent No. 4,026,-121 (the "Aokage patent").[3] (D.I. 77.) Tyler replied to Kysor's counterclaims and asserted that the contention that Kysor's Aokage patent is invalid and unenforceable with a number of various other defenses including a contingent antitrust claim. (D.I. 84.)

The case was tried on the validity and infringement issues to the Court without a jury from August 20 to 24, 1984.[4] After carefully considering the sufficiency, weight and credibility of the testimony of the witnesses, their demeanor on the stand, the documentary evidence admitted at trial and the post-trial submissions of the parties, the Court enters the following findings of fact and conclusions of law which are embodied in this opinion as permitted by Rule 52(a), Fed.R.Civ.P.

## II.  THE FACTS

### A.  *The Invention In Issue*

The invention claimed by both parties is a new and unique technique for defrosting upright, open front refrigerated display cases of the type usually seen in supermarkets for merchandising frozen food products. (D.I. 290, III, ¶ 7; DX 1 & 3.)[5] These types of display cases, as they developed during the 1960's and early 1970's, employed two or three adjacent and parallel air curtains flowing down out of upper outlets and across the front to lower return openings. The primary or innermost curtain is refrigerated. The secondary or guard air curtain is not. Both the primary and secondary air curtains are recirculated around the interior of the display case in

internal ducts. If an optional third or outermost ambient air curtain is used, that curtain is formed by a partial duct at the top of the display case and is not recirculated but simply flows down across the face of the case onto the floor of the store. All of this technology was known prior to all the patents at issue in this action. (D.I. 290, III, ¶ 5.)

A refrigeration coil, located in the innermost duct of the case, is used to cool the air of the primary air curtain. Because of the build-up of frost, this coil requires periodic defrosting of its surface area several times a day. Prior practice of defrosting included using an electric heater to heat air flowing over the coil, using warm ambient room air for that surface, or using a hot gas flow inside the coil. (*Id.*, ¶ 6.)

All of Tyler's Subera patents and Kysor's Aokage patent at issue here include embodiments which invoke reverse flow air defrost accomplished by reversing the normal flow of air circulation in the secondary or guard band conduit. (*Id.*, ¶ 7.) This results in ambient air being drawn into the primary air band conduit so that during the defrost cycle, when the refrigeration mechanism is turned off, the primary air band flowing over the refrigeration coil is warmed sufficiently to defrost the coil. (*Id.*)

This "reverse flow air defrost" concept is advantageous in that it enables low cost construction of the display cases and, by using warm room air for defrosting, saves energy. (*Id.*, ¶ 8.) The commercial display cases marketed by both Tyler and Kysor use reversible fans in the secondary or guard duct to achieve the reverse air flow. (*Id.*)

For purposes of determining infringement of claims 3 and 6 of the Aokage 121 patent (DX 1), the Tyler's model D6F display case (DX 3) is considered representative of all Tyler models charged by Kysor

---

**3.**  The Aokage patent through assignments is owned by Kysor. (*Id.*, ¶ 3.)

**4.**  Post-trial briefing was completed on October 22, 1984.

**5.**  "T" and "DX" will refer to Tyler's and Kysor's trial exhibits respectively; "Tr." will refer to the transcribed trial testimony; "D.I." refers to items on the docket sheet.

with infringement. (D.I. 290, III, ¶ 9.) For purposes of determining infringement of claims 35 and 36 of the Subera '720 patent, claims 1–3 of the Subera '747 patent, and claims 1–12 of the Subera '922 patent (T. 98, 99 & 100), the Kysor display case model L5FA (T. 95) is considered representative of all Kysor models charged by Tyler with infringement. (D.I. 290, III, ¶ 10.)

B. *Development of Invention and Chronology of Activities of Kysor/Tyler/Fuji*

Some decades ago, retail stores began to market refrigerated and frozen foods in self-service display cases. At that time, there were two types of commercially available display cases capable of holding the necessary low temperatures for frozen foods and ice cream. One type was an enclosed cabinet allowing temporary access by the customer through structural doors on the front or the top of the cabinet. The second type was an open top bin which used a gravity-retained pool of cold air in which the food products were immersed. Both of these types of units had the disadvantage of poor display and accessibility. In 1954, Edward Simons, becoming aware of the desirability of an open front display case comparable to old fashion open shelving but under low temperature refrigeration, conceived of, and was granted, United States Patent No. 2,862,369 on December 2, 1958, which was reissued to correct certain errors in 1973 as Re 27,566. The Simons basic invention was the first open front, multiple curtain, refrigerated display case. Prior to issue of the Simons patent, Simons had entered a license agreement with the Chicago Stock Yards enterprise, a predecessor of Kysor, in order to commercialize the invention and make improvements thereon. As a result of these improvement efforts, the first "Dual Jet" display case was placed on the market in 1962. By the mid-1970's, virtually every United States manufacturer involved with refrigerated display cases was marketing such cases in

accordance with the "Dual Jet" technology developed by Dr. Sterling Beckwith. (DX 11; Tr. 576–77; 466; 19.)

One of the aspects of the Beckwith technology concerned velocity gradients among the refrigeration band, guard band, and ambient band. The testimony at trial was clear that the practice of having the refrigeration band operate at the greatest velocity, the guard band operate at the lower velocity, and the ambient band operate at the lowest capacity, was well-known. (Tr. 580; 466; 516; 348.) Thus, these techniques of how to construct a display case of the types involved, how to efficiently operate during the refrigeration cycle, and how to defrost it while maintaining a protective air curtain across the open front were all well known to those skilled in the art in the mid-1970's.

In 1974, Yoshitaka Aokage and Yoshio Yamana, design engineers of Fuji Denki Seizo ("Fuji"), a Japanese company, and Kysor's Japanese licensee[6] (Tr. 461–65; 469; DX 265, at 6, 9), began working on the development of an air defrost system. (Tr. 466–71.) During this work, they conceived the idea of using reversible motor fans to reverse the air flow in certain of the recirculating air ducts while continuing the normal flow of air in the other ducts (Tr. 468; 471–72; 479; DX 265 at 9–11), in order to obtain air defrost of the refrigeration coil. This idea for the use of reversible motor fans in refrigerated display cases after testing blossomed into an application for a Japanese patent filed by Fuji on May 20, 1975 which resulted in the publication of the Japanese patent on June 6, 1977. (T. 224; D.I. 156, ¶ 91.)

The Aokage concept of air defrost was widely promoted at two trade shows in 1976. The first trade show, the 10th Japan Self-Service Association Show ("the 10th JSSA Show"), was held in Tokyo on March 3–6, 1976. (DX 156, ¶ 1.) The second trade show, known as the Third Tohoku Exhibition, occurred on April 9–11, 1976, in Sendai City, Japan. (DX 156, ¶ 33.) At both

---

**6.** Because of Fuji's licensing arrangement with Kysor, both companies exchanged and shared technical information relating to open front refrigerated display cases. (DX 265 at 6; Tr. 469.)

shows, the Aokage concept was publicly disclosed by means of a large photoprint drawing display panel and a related printed description panel. (DX 156, ¶ 3–73 and see photograph exhibits referred to therein.) Copies of the hand-printed and offset-printed brochures describing the Aokage air defrost concept were also available and distributed at the two trade shows. (*Id.,* ¶¶ 28–32; 43–49.)

Among the many visitors at the 10th JSSA Show were representatives of Tyler's joint venturer and joint venture company in Japan. (DX 4, Adm. 1 & 7; DX 37; D.I. 156, ¶ 27.) At the time of the 10th JSSA Show, Okamura Tyler Co., Ltd. ("Okamura Tyler") was a Japanese corporation jointly owned by Okamura Seisakusho and Clark Equipment Company ("Clark Equipment") which then owned Tyler. (DX 156, ¶ 19.) Numerous agreements including joint venture, patent licensing, marketing and other agreements existed between these Japanese companies, Tyler's parent company and their affiliates. (*Id.,* ¶ 19.) One of the licensing agreements required Okamura Tyler to disclose promptly to Clark Equipment "all improvements, inventions, Patents and patent applications made or otherwise acquired by LICENSEE...." (*Id.,* Ex. 2.) Tyler thus received reports of Okamura Tyler activities and communicated and conferred frequently with its representatives. (DX 262, 84, 85, 87–114; DX 157–215; DX 4, Adm. 5.)

Shortly after the 10th JSSA Show, the marketing manager of Okamura Tyler called Mr. M. Furubayashi, a Fuji salesman, to inquire whether Fuji would sell reversible showcase fan motors. (D.I. 156, ¶ 21.) Between April 8 and 14, 1976, Sam West, the licensing executive of Tyler, conferred with the same marketing manager and other Tyler Okamura personnel in Japan. (D.I. 117 at 70–78.)

After Mr. Aokage was transferred to New York City in October 1975, he corresponded with Robert E. Vogel of Kysor on December 23, 1975, and told him of the Aokage air defrost concept and noted that it had been developed in Japan and was to be used in a Fuji display case. (T. 140.) While Mr. Vogel at first had some questions as to how the Aokage concept worked, Kysor undertook to run tests of its own at Marshall, Michigan, and on April 22, 1976, practiced the concept in the United States. (D.I. 163 at 99; D.I. 167 at 13–15.) [7] These tests were run in accordance with Mr. Aokage's communications. (D.I. 164 at 214–15.)

On May 17, 1976, an application for a U.S. Patent, based on the Aokage concept later published in the Japanese Aokage patent, was filed. (DX 2.) The U.S. Aokage patent issued on May 31, 1977, and was given the foreign (Japanese) priority date of May 20, 1975. (DX 1.)

Turning now to Tyler's work in developing an air defrost system, it appears that a so-called "brain storming" session was held on October 17, 1974, attended by research and engineering personnel of Tyler to consider and explore points of interest to be incorporated in multi-shelf freezers. (T. 1; Tr. 430.)

In the report of that meeting attended, among others, by Fayez F. Ibrahim, a project engineer of Tyler (Tr. 18), Melvin Steelman, an electrical engineer in Tyler's research and test lab (Tr. 428), and Arthur Perez, a Tyler plant manager (Tr. 432), contained the following language:

"13) Attempt air defrost through the use of:

a) Two-speed reversible motors

b) Two-speed standard air movement with a provision to direct the air away from product area during operation. Note: Take a look at air defrost patent

---

7. While Mr. Vogel at his deposition testified he practiced the Aokage concept on April 23, 1976 (D.I. 163 at 99), he amended his testimony in his deposition errata sheet to point out that the tests were run on April 22, 1976 (D.I. 167 at 13–15) and corroborated that the reverse flow air de-

frost was performed on April 22d by attaching two temperature sheets. (D.I. 167.) Mr. Bruce Merwin, Vogel's former assistant, also confirmed the successful defrosts to have been run on April 22, 1976, from recorded test data. (D.I. 281 at 118–25, 122.)

since there is some indication air defrost is prior art."

Nothing, however, really pertinent to this case developed from this memorandum other than Ibrahim and Steelman shortly after the meeting contacted motor manufacturers seeking reversible motors but learned that what was available was not suitable for their purposes. (Tr. 25–26; Tr. 433.)

It was not until mid-1975 that Ibrahim purchased from General Motors six 5-inch, open type reversible electric motors used in window air conditioning units. (Tr. 26; 30.) But rather than testing these reversible motors on reverse flow air defrost, Ibrahim and Elmer Subera, a Tyler lab technician, proceeded to run tests at the Crocker Party Store in May and June 1975 with an air defrost concept that is entirely different than the one at issue in this case which consisted of stopping the secondary band and speeding up the other bands. (T. 6; Tr. 145–48; Tr. 374–76.)

In April 1976, Subera and Steelman began constructing a cabinet to use reverse air flow in the secondary band for defrost by the use of a "pivoting fan panel." (Tr. 283–89; T. 39.) The cabinet was completed on April 22, 1976, to embrace such a "pivoting fan panel" (Tr. 288; T. 41; T. 31), and on April 23, 1976, Subera and Steelman, using the pivotal fan panel installed in a test cabinet (T. 51) on a second try, successfully ran a defrost by reversing the air flow in the secondary band. (T. 47, T. 48, T. 50; Tr. 293–97, 353–55.) This test on April 23, 1976, amounted to an actual reduction of practice of a refrigerated display case with secondary band reverse air defrost using a pivoting fan panel arrangement as later disclosed in Figures 1 and 2 of the Subera ('720) patent, as the first embodiment of that patent. (T. 98 & 182; Tr. 286–300.) Although Tyler had acquired reversible motors in 1975, it was not until November, 1977, that tests were run by

Tyler in reversing the secondary band to obtain defrost by using reversible motors. (Tr. 189–91.)

Despite this, the application filed on April 25, 1977, which matured in the Subera ('720) patent, contained a second embodiment for air defrost flow by the use of reversible fans in the secondary chamber. (T. 98 at 7; T. 182 at 8.)

After the Aokage '121 U.S. patent issued on May 31, 1977 (DX 1), the claims of Subera patent application No. 790,654, which matured into the Subera '720 U.S. patent, were rejected by the Patent Examiner in the United States Patent and Trademark Office ("PTO") under 35 U.S.C. § 102 on the ground of lack of novelty in that the Aokage '121 U.S. Patent anticipated the invention. (T. 98 at 34.) The rejection of these claims was overcome when Tyler by argument was able to convince the Examiner that, even though the Aokage '121 patent was prior art, there was a functional distinction between the Aokage patent and the Subera application because the Aokage patent did not provide for maintenance of the air curtain during defrost while the Subera invention did. (T. 98 at 48–50.) As a result, the Subera '720 patent was issued on March 20, 1979. (D.I. 290, III, ¶ 4.)[8]

## III. VALIDITY OF SUBERA PATENTS

### A. *Anticipation*

Kysor contends and has proved by clear and convincing evidence that the pertinent claims of the Subera patents are anticipated (i.e., lack novelty) because the elements of those claims are present expressly or inherently in the prior art represented in the Aokage patent and concept. After the Aokage U.S. patent issued and the Subera patents were rejected by the PTO as having been anticipated, Tyler's attorney by argument convinced the Examiner that there was a functional distinction between Aokage and Subera. The attor-

---

**8.** The Subera '747 patent which was issued June 17, 1980, and the Subera '922 patent which was issued August 18, 1981, are divisions of the Subera '720 patent. These latter two patents have the same disclosure as in application No. 790,654 which became the '720 patent. (D.I. 290, III, ¶ 4.)

ney then argued[9] that the Aokage patent does not provide for maintenance of an air curtain on defrost while the Subera does. The argument made to the Patent Examiner by Tyler and also advanced to the Court is based almost entirely on a few lines from column 3 and 4 of the Aokage patent. (DX 1.) Beginning on line 59 of column 3, the Aokage patent describes the operation of the first embodiment in part as follows:

In this manner, the air curtains A, B, and C formed in parallel upon being ejected from their respective nozzles at the time of cooling operation as indicated in FIG. 1 are disturbed, and *portions* of air flows at the ejection nozzles and suction inlets of the passages 4, 5, and 10 become short-circuited into neighboring passages. As a result, in the passage 4 for circulation of cold air, the flowing air no longer forms an air curtain to undergo circulation within the passage 4. (Emphasis added)

(DX 1, column 3, line 59 *et seq.*)

As the patent makes clear, the above quoted statement describes the flow of air in the primary or refrigeration band which, in the first embodiment, is reversed.

Several paragraphs later, the Aokage patent generally describes the second embodiment, which corresponds to the Subera patents.

"In this defrosting operation, also, the air curtains in the cooling operation are disturbed as described hereinbefore...."

(DX 1, column 4. lines 21–23.)

Tyler contends that the reference in the above quotation that the air curtain is "disturbed as described hereinbefore" in the second embodiment refers to the reference in column 3 (quoted above) to the absence of an air curtain in the reversed refrigeration band in the first embodiment, rather than to short circuiting.

The Court finds that this argument is without merit for several reasons. First, Tyler's contention ignores the language in column 3, lines 59 through 65 which expressly refers to "portions" of the air flow from the ejection nozzles and suction inlets being "short-circuited." As Mr. Aokage testified, this reference to the air curtains being "disturbed" as described hereinbefore was to the "short-circuiting" described in column 4:

Q. Referring back to the patent in suit, the English version which uses the words "as described hereinbefore," what do those words mean in Column 4?
A. As far as my understanding, "as described hereinbefore," it's related to Column 3, Line No. 62 to 65.
Q. For the record, is that where it refers to the air curtains A, B and C of Figure 1 are disturbed and portions of air flows at the ejection nozzles and section inlets of the passages 4, 5 and 10 become short-circuited into neighboring passages; is that what you were referring to?
A. Yes.

(Tr. 500.)

Thus, the language "as described hereinbefore" in the *second embodiment* refers to disturbance with portions short-circuiting, and not to the loss of an air curtain in the primary (refrigeration) band (which is reversed) in the *first embodiment.*

Second, the statement in paragraph 3, concerning air no longer forming an air curtain, expressly refers to the first embodiment, where the primary (refrigeration) band was reversed. No valid reason exists for applying this statement to the *second embodiment,* where the primary (refrigerated) curtain continues in the forward direction ejecting air downward across the open front of the case. All pertinent evidence substantiates the fact that, if the primary air curtain continues to flow in the forward direction, portions of the air continue to flow down the open front as Aokage expected. The reference to the air curtains being disturbed "as described hereinbefore" in column 4 obviously was a

9. The original claims in the Subera patent did not include this distinction. The distinction was advanced for the first time entirely by Ty-ler's attorney without conferring with the patent applicants. (DX 5, Int. 49 & 50.)

reference to the previously described "short-circuiting" that causes the defrosting of the case.

Tyler's attorney repeatedly questioned Mr. Aokage concerning the absence of an arrow in the middle of the open front of the case in Figure 2 of the Aokage patent as indicating the absence of an air curtain on defrost. (DX 2.) Mr. Aokage explained, however, that the purpose of the patent was to describe the air used to *defrost* the case (not the well-known characteristic of maintaining an air curtain) and that the patent expressly referred to only *portions* of the air being short-circuited:

A. In our patent, we don't say no air curtain is disappeared or anything like that. Just we are saying *defrost air flow is no longer formed air curtain.*
Q. With respect to Figure 2 and the illustration of the defrost cycle of the second embodiment, do you believe any arrows representing the flow of ambient air missing from this figure?
A. Excuse me (consulting Ms. Kaiser). Those arrows on Figure 2 only describe *portion* of air flow. So, therefore, there are many air flow. That's why, if you describe so many air flow, we can't figure out how many numbers are here with the air flow.

(Tr. 505.)

Messrs. Subera and Aokage agree that it is not practical or necessary to show drawing arrows for all air flow. (Tr. 357–58, 477.) The Aokage patent discloses that the air curtain in the second embodiment was disturbed, not that it was destroyed. (Tr. 545–46.) While the Court is aware that Tyler's witness, Mr. Ibrahim, testified that he read the Aokage patent as teaching that the air curtain is eliminated in the second embodiment on defrost (Tr. 65–66), this testimony is no more than the argument advanced by Tyler's attorney to the PTO.

Finally, a compelling reason for rejecting Tyler's interpretation of the Aokage patent is that it defies logic. It was and is well known to those skilled in the art that the elimination of air curtain flow would permit ambient air to enter the case and harm the product. (Tr. 476, 319–20.) Thus, Tyler's argument that the Aokage patent taught those in the art to destroy the protective air curtain during defrost ignores common sense, distorts logic, and misinterprets the express words of the patent in the light of prior well-known phenomena.

At trial Tyler introduced videotaped evidence concerning an *ex parte* test initialed by Mr. Ibrahim. The test was done on a special laboratory display case that started as a non-commercial prototype and was then further altered before the test was run. (Tr. 367–69.) The test purported to demonstrate that a case could be set up in such a way that, upon reversal of the air flow in the secondary or guard band, all of the air ejected from the primary band could be short-circuited. The apparent purpose was to show that it was *possible* to completely destroy the air curtain. (*See* Tr. 69 *et seq.*) Tyler also asserted that the case so constructed complied with ASHRAE operational standards for meat and dairy cases. (Tr. 154–57.)

To accomplish the result which Ibrahim desired for purposes of this litigation, he also drastically altered the velocity gradient universally used in multiband freezer cases. (Tr. 580, 466, 516, 348.) Instead of having the refrigeration band operate the fastest, with the next two bands operating at somewhat different slower velocities, Ibrahim slowed the refrigeration band severely (to about 350 feet per minute) while running the secondary band at a much faster rate (about 550 feet per minute). The ambient band was set at 200 feet per minute. (Tr. 161.) The nozzles were all at the same level in contrast to standard construction. (Tr. 368–69.) Under those conditions, according to Ibrahim, the entire air flow of the slower moving refrigeration band is sucked during defrost into the faster moving secondary band.

The Court finds this *ex parte* test to be of little value to this case. First, it proves nothing since, as explained earlier, the Aokage patent specifically discloses that only *portions* (and thus not all) of the air are short-circuited during defrost. The balance

of the ejected air continues its normal flow downward as an air curtain. The fact that Mr. Ibrahim was allegedly able to do something different proves nothing.

Second, even if such a case would comply with ASHRAE tests for meat and dairy cases, multiband cases of this type are used almost exclusively in the U.S. for frozen foods. Messrs. Ibrahim and Subera both agreed on this issue. Tyler does not manufacture a multiband dairy or meat case. Moreover, it was not established that the case operated according to ASHRAE standards. Ibrahim admitted that information as to the location of the temperature indicating thermocouple was missing (Tr. 156–57) so that the ASHRAE requirement of knowing the location of the warmest thermocouple could not be met. Although Ibrahim tried to dismiss this fact as unimportant, Mr. Subera readily admitted that the location of thermocouples is essential for test validity and data accuracy. (Tr. 330.)

Finally, the tests run on this test case were not authenticated in any meaningful way. Ibrahim was away on vacation while the tests were being conducted and the ASHRAE data were taken. (Tr. 155, 160.) Some of the crucial data were missing (Tr. 156–57) and a videotape respecting an earlier related test was destroyed without being produced to Kysor. (Tr. 164.) Moreover, Kysor was not notified that the test would be made or permitted to witness the test. (Tr. 203.)

Thus, while the Court has found that the language of the Aokage patent to one skilled in the art does not disclose that an air curtain across the front of the case would be entirely eliminated, there are equally compelling reasons for the Court to find that maintenance of the air curtain on defrost was inherent in the Aokage design.

First, the clear and convincing evidence demonstrates that an air curtain is inherent and automatically occurs when the air flow in the guard band is reversed as testified to by Aokage, Yamana, Tatebayashi and Oka-

moto. (Tr. 472; DX 267 at 11, 13–15; DX 266; DX 265 at 2–4.)

Second, this testimony is confirmed by the testimony of Tyler's witnesses. At trial, Mr. Subera was asked whether maintenance of an air curtain was inherent in the Tyler case when the secondary band was reversed, as he had testified during his deposition. His answer was that maintenance of an air curtain was inherent "in the design of the case":

Q. The air curtain that was being maintained during defrost, was that development an idea of yours to maintain the curtain on defrost?

A. That was already in the design of the case.

Q. That was an inherent part of the case?

A. That was already a design of the case, yes.

Q. Did that happen automatically when the case was operated in defrost?

A. It maintained its air curtain during defrost.

Q. Did that happen each time, to your knowledge, that the case was put on defrost?

A. That I had it in defrost, yes.

(Tr. 349.)

Mr. Subera also confirmed at trial his prior deposition testimony that maintaining an air curtain on defrost was not his idea but occurred as an "inherent part of the case." (Tr. 350.) His answer in the context given means that he did nothing to "design" the maintenance of the air curtain and that he simply reversed the air flow in the secondary band of a display case constructed as then well known and the air curtain was automatically maintained.

Melvin Steelman also testified on deposition that suction at the top of the case caused by reversal of the secondary band would not disrupt or divert the air curtain and "[y]ou would still have your defrost." (D.I. 127 at 153.)[10] He also added that:

---

**10.** While the Steelman and Perez depositions (D.I. 127 and 130) were not specifically intro- duced in evidence, they are a part of the Court's record and have been cited by opposing sides in

Q. Aside from that, what about the air curtain?

A. We would still have.

Q. Why is that? Was that an inherent function of the arrangement?

A. Yes, we haven't changed the primary band, Its [sic] cold air, its [sic] dropping down here, cold air dropping down. As I say, it might make it a little less efficient but it would not eliminate it.

Q. So that the air curtain would inherently come down out of the refrigeration band and be maintained across the front of the case during defrost?

A. Yes.

(*Id.* at 153–54.)

Arthur Perez, Assistant to the President of Tyler, provided similar deposition testimony:

Q. If the motor in the secondary band of the standard C6F Tyler case is reversed, is the air curtain in the refrigeration band inherently maintained?

A. Yes.

(D.I. 130 at 317.)

Because the Tyler display cases use the standard velocity gradient pursuant to which the air in the primary band is propelled at a faster rate than air in the other two bands (Tr. 348), the testimony of all these individuals reinforces the inherency of an air curtain on defrost where the Aokage concept is applied to a display case constructed in accordance with the known and standard practice.

Accordingly, the Court finds, based on the credible evidence, that (1) the Aokage patent does not teach that an air curtain is not maintained on defrost, and (2) that, indeed, the maintenance of an air curtain on defrost is inherent in like structures of the Aokage and Subera patents.

The Court having found (1) that the pertinent claims of the Subera and Aokage patents properly construed disclose the same

elements of the claimed inventions, (2) and additionally, that the purported functional distinction of the maintenance of the air curtain on defrost in the Subera patent relates to a function which is inherent in the Aokage concept, the Court must now determine whether the Aokage patent is prior art which anticipated the Subera patents.

The Court finds by clear and convincing evidence, fully corroborated, that the Aokage invention was prior art and anticipated Subera's invention for two different and independent reasons.

First, the U.S. Aokage patent application was filed on May 17, 1976 before, and the Aokage patent was issued on May 31, 1977 after, the Subera '720 application was filed on April 25, 1977. (DX 1; T. 98.) The Aokage patent was also given the benefit of its Japanese application priority date of May 20, 1975 under 35 U.S.C. § 119. (DX 1.)

■ Tyler correctly contends that under 35 U.S.C. § 102(e),[11] the effective date of the Aokage patent as a prior reference is its May 17, 1976 U.S. filing date and not the foreign filing priority date of May 20, 1975, when the Aokage Japanese patent application was filed. *Application of Hilmer*, 359 F.2d 859 (CCPA 1966); *Eli Lilly & Co. v. Brenner*, 375 F.2d 599 (D.C.Cir. 1967); *Waterman-Bic Pen Corp. v. W.A. Sheaffer Pen Co.*, 267 F.Supp. 849 (D.Del. 1967). Tyler, relying upon the principles set forth in *Kardulas v. Florida Machine Products Co.*, 438 F.2d 1118 (5th Cir.1971) and *In re Eickmeyer*, 602 F.2d 974 (CCPA 1979), contends that if it carried its burden of proof to demonstrate that the Subera invention was reduced to actual practice before the Aokage U.S. patent filing date, it has effectively removed the Aokage patent as a prior art reference against the Subera patents under 35 U.S.C. §§ 102(e)

their post-trial briefs. (D.I. 302 at 40; D.I. 305 at 16–17.)

11. 35 U.S.C. § 102(e) reads in pertinent part: A person shall be entitled to a patent unless—
　　\*　　\*　　\*　　\*　　\*　　\*

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent.

and 103. Since the Court has already found as Tyler contends (D.I. 302 at 14–15) that Subera reduced his invention to actual practice on April 23, 1976, before the Aokage U.S. application was filed on May 17, 1976, it would appear that under § 102(e), the Aokage patent was removed as anticipating art.

This conclusion, however, does not end the matter because of the statutory provisions contained in 35 U.S.C. § 102(g). Under that provision, Subera is entitled to a patent unless, before Subera's reduction to practice, the identical Aokage concept was reduced to practice in this country by Kysor and the Aokage invention had not been abandoned, suppressed or concealed.[12] In this case, the Court has found by clear, convincing and corroborated evidence, that, although the Aokage invention was conceived and reduced to practice in Japan in 1975, it was also, in accordance with Mr. Aokage's instructions, actually and successfully practiced in the United States at Marshall, Michigan, on April 22, 1976, one day before Subera reduced it to practice. Furthermore, there was no abandonment, suppression or concealment of the invention because in less than a month on May 17, 1976, the Aokage U.S. patent application based on the Japanese patent was filed with the PTO. Accordingly, the Court concludes that, under § 102(g), the Aokage invention having been successfully practiced in this country before the Subera concept was practiced here, the Aokage invention was prior art and anticipated the Subera patents rendering them invalid for lack of novelty under § 103.[13]

■ There is, however, a second and independent ground for finding that the Aokage invention anticipated the Subera patents because Tyler admitted Aokage is prior art to the PTO and that admission is binding.

On December 12, 1980, after the Subera '720 and '747 patents had been issued and the Subera '922 application claims on file were allowed, the attorney prosecuting the latter application admitted on behalf of the applicants and Tyler that the Aokage '121 was "prior art" as to all three of the Subera applications. (T. 100, Paper # 11D at 4–5.) On page 4 of this wrap-up amendment, the Tyler attorney admitted in his discussion as to "all the claims" of three Subera applications, that:

> "The most pertinent available *prior art* known to the Applicants and their representatives is the Aokage U.S. Patent 4,026,121 cited by the Examiner." (Emphasis added)

■ An admission of the existence of prior art is binding upon an applicant/patentee. The controlling law is summarized in 2 Chisum, D., Patents, *A Treatise on Law of Patentability, Validity, And Infringement*, § 5.03[3][e] (1981) as follows:

> "It is now settled that an applicant's admission as to the relevant art—both in terms of available sources and in terms of scope of the art—will be accepted as binding upon him."

Those cases supporting this principle are: *In re Nomiya*, 509 F.2d 566, 570–71 (CCPA 1975); *In re Hellsund*, 474 F.2d 1307, 1311 (CCPA 1973); *Corning Glass Works v. Brenner*, 470 F.2d 410, 419 (D.C.Cir.1972); *In re Lo Presti*, 333 F.2d 932, 934 (CCPA 1964). It does not matter as to which section or subsection of 35 U.S.C. §§ 102 and 103 the admission relates because what is determinative is that the information "is prior art of some type." *In re Garfinkle*, 437 F.2d 1001, 1004 n. 2 (CCPA 1971); *In*

---

12. 35 U.S.C. § 102(g) reads in relevant part:
A person is entitled to a patent unless—
\* \* \* \* \* \*
(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.

13. Tyler, in its opening brief (D.I. 302 at 7), also suggested that the Subera invention was reduced to practice on April 15, 1976 (D.I. 302 at 7). The repeated references in Tyler's opening brief (*id.* at 14–15) to the April 23, 1976 reduction to practice date indicates that Tyler does not seriously regard the April 15 activities as a true reduction to practice. Furthermore, the evidence pointed to, that there was a successful reduction of practice of Subera patent on April 15, 1976, is not clear and convincing.

*re Nomiya, supra,* 509 F.2d at 570–71. As the Court explained in *In re Nomiya,* 509 F.2d at 571, n. 5:

> [T]he basic proposition that a statement by an applicant, whether in the application or other papers submitted during prosecution, that certain matter is "prior art" to him, is an admission that the matter is prior art for *all* purposes, whether or not a basis in § 102 can be found for its use as prior art. (Emphasis in original)

The statement made during the prosecution of the Subera patents that Aokage was prior art was unqualified and binds Tyler. Because the Court has found that the Aokage and Subera inventions are functionally the same, the Subera patents were anticipated (lack novelty) over the Aokage concept and the Subera patents are invalid.

### B. *The 35 U.S.C. § 102(b) Bar to the Subera Claims*

As noted in the findings of fact above, Fuji conducted an intensive publicity campaign in Japan concerning its reverse air flow defrost system at two trade shows in the Spring of 1976. The disclosure of the new idea included displays of large photoprint panels of the Aokage concept at the 10th JSSA Show on March 3–6, 1976, and the Third Tohoku Exhibition on April 9–11, 1976, together with written descriptions thereof and offset and xerographic copies of brochures that were distributed.

These display panels and brochures were one of the subjects of Kysor's summary judgment motion filed earlier in this litigation. This Court, in its opinion on that motion, noted that 35 U.S.C. § 102(b) establishes that a patent is invalid if "the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States...." *Tyler Refrigeration Corp. v. Kysor Industrial Corp.,* 553 F.Supp. 279, 282 (D.Del.1982).

In that decision, the Court declined to grant summary judgment because it found that "as a general rule the determination of whether materials are printed publications is a mixed question of law and fact which can be determined only after trial." (*Id.* at 284.) Nevertheless, in reaching that conclusion, this Court described the legal guidelines which were to apply to this issue at trial.

Accordingly, the Court held, "the photoprint panels, the written description thereof and the offset and xerographical copies of the Brochure" could fall within the Section 102(b) definition of a printed publication. (*Id.*) *Citing Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.,* 546 F.2d 530 (3d Cir. 1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977); *Philips Electronic and Pharmaceutical Industries Corp. v. Thermal and Electronics Industries, Inc.,* 450 F.2d 1164 (3d Cir.1971); *I.C.E. Corp. v. Armco Steel Corp.,* 250 F.Supp. 738 (S.D.N.Y.1966); *In re Wyer,* 655 F.2d 221 (CCPA 1981) (en banc); *Regents of University of California v. Howmedica Inc.,* 530 F.Supp. 846 (D.N.J. 1981), *aff'd,* 676 F.2d 687 (3d Cir.1982). The crucial question was stated to be whether the panels and brochures were " 'sufficiently accessible to the public,' so that 'persons concerned with the art' ... have had an opportunity to inspect and digest the information." *Tyler Refrigeration Corp. v. Kysor Industrial Corp.,* 553 F.Supp. 279 at 282–83, *citing Philips,* 450 F.2d at 1171. Although this Court was unable to reach the factual conclusions on a Motion for Summary Judgment, the evidence which has subsequently developed at trial is decisive.

The 10th JSSA Show included display booths by a number of exhibitors, including a booth operated by Fuji known as the Warren/Fuji booth. (D.I. 156, ¶ 2.) At the Warren/Fuji booth were the large photoprint drawing display panel and printed description panel disclosing the Aokage concept. These panels are accurately depicted in several exhibits before this Court. (DX 67, 69 and J12 (195) and J12 (196) of

DX 43.) [14] The preparation of the display panels is described in paragraphs 6 through 13 of the Stipulation of Facts. (D.I. 156.) The Aokage concept was understood from these panels by Japanese visitors, as set forth in the depositions of Japanese witnesses and by American visitors, some of whom were associated with Kysor (D.I. 118 at 39–43) and some of whom were not (D.I. 296A at 24).

The photoprint drawing display panel and the related printed description panel, with the agreed translation into English, are described in paragraphs 13 through 17 of the Stipulation of Facts. (D.I. 156.) There is no dispute that large numbers of people attended the 10th JSSA Show. (D.I. 156, ¶ 18.) Some of those people are shown in the photographs in DX 38 and DX 43. (D.I. 156, ¶ 22.)

Tyler has admitted that many visitors to the 10th JSSA Show saw the Warren/Fuji booth and the reverse flow air defrost photoprint drawing display panel figures as well as the description display panel. Some of these visitors carried cameras and appeared to take photographs of the Warren/Fuji booth, including the photoprint drawing display panel and the description display panel. Mr. Nakanishi, an independent professional photographer hired by Fuji, attended the 10th JSSA Show for a full day and took photographs including several of the Warren/Fuji booth and the display cases and panels in the Warren/Fuji booth. (D.I. 156, ¶ 23; DX 43.) Mr. Kurokawa of Gaudy Corporation also took many photographs of the Warren/Fuji booth at both shows. (DX 37; DX 40.)

Tyler's representatives were at the 10th JSSA Show, and observed the displays at the Warren/Fuji booth. (DX 4, Adm. 8 & 9.) As a JSSA director and president of his supermarket company testified, the new air defrost method was a "dramatic introduction" to the industry. (DX 280 at 2 & 17.)

The Third Tohoku Exhibition, held in Sendai City, Japan, on April 9–11, 1976, also included a display booth by Warren/Fuji. That booth included the same photoprint drawing display panel and description display panel disclosing the Aokage concept which were presented at the 10th JSSA Show. These panels, as they appeared at the Third Tohoku Exhibition, are depicted in Exhibits J7(2) of DX 38; J9(3) of DX 40; J24 (18) of DX 57, and DX 71. (D.I. 156, ¶¶ 35–39.) DX 38 includes photographs by Mr. Kurokawa of Gaudy Corporation of portions of the Third Tohoku Exhibition. Tyler has also admitted that many visitors to the Third Tohoku Exhibition saw the Warren/Fuji booth as well as the panels disclosing the reverse flow air defrost concept. (D.I. 156, ¶ 42.)

In addition to prominently displaying the photoprint drawing and description display panels (under floodlights), Fuji also disseminated brochures disclosing the very same concept at, prior to, and after, the 10th JSSA Show and the Third Tohoku Exhibition. These brochures fully disclosed the Aokage reverse flow air defrost concept which is the subject of the Tyler patents. The first brochure, which was handprinted, was prepared in February 1976 by Fuji engineers Tsuneo Tatebayashi and Shozo Okamoto. The identification number B09–01 was applied to this document. DX 32 is a copy of the document in this form. The letter "B" when applied to Fuji technical brochures indicated that Fuji personnel were permitted to show or give copies of the technical brochure to customers. (D.I. 156, ¶¶ 6–8.)

■ Okamoto then supplied the description and drawing figures to Mr. Kyoichi Kurokawa of Gaudy Corporation, who used the drawings to prepare the photoprint drawing display panel and printed description panel. (*Id.*, ¶¶ 9, 11.) Specifically, the photoprint drawing display panel was made by preparing inked drawing figures from

---

**14.** Exhibits J12 (195) and J12 (196) of DX 43 are enlargements of portions of the movie film which appears as DX 39. These enlargements show portions of the photoprint drawing display

panel. DX 67 and DX 69 are enlargements of portions of Exhibit J7 (2), DX 38. (D.I. 156, ¶ 13.) The parties have stipulated to the admissibility of all of these exhibits.

the drawings with colored arrows supplied by Okamoto (DX 32), photographing the drawing figures and greatly enlarging the photograph. Blue and red colored arrows in the lower two figures of this photograph corresponded to the colored arrows on the document prepared by Tatebayashi. The photo was then attached to a wood panel mounted vertically. (*Id.*, ¶ 12.) Thus, the drawings shown in the handwritten brochure B09–01 were *the very same drawings* used to prepare the photoprint drawing display panel.[15]

The hand-printed brochure was distributed in several ways. First, Okamoto sent copies to numerous Fuji personnel with a cover letter dated February 23, 1976. (DX 34.) The persons who received the brochure were aware of the fact that they were free to distribute it, since the letter "B" in the control number B09–01 meant that it could be given to customers. (D.I. 156, ¶¶ 8, 10.)

Secondly, the hand-printed brochure was distributed by numerous Fuji employees to customers who attended the 10th JSSA Show. Takao Teranishi, of Fuji, personally distributed about twenty copies of the brochure to customers. (DX 278 at 3–4.) Mr. Kawase handed it out to customers. (DX 268 at 2–4.) Mr. Okamoto gave more than ten copies to JSSA visitors. (DX 267 at 3.) Persons present at the 10th JSSA Show, including potential customers Koizumi, Ishihara, and Yukimitsu, recall that they received the brochure, understood the ideas conveyed, and took copies. (DX 269 at 8–9; DX 282 at 4–6; DX 279 at 5–7; DX 280 at 4–5.)

In addition to hand-printed brochures, Okamoto also obtained offset-printed copies of brochure B09–01 from Sansei Printing Co., for distribution both before and during the Third Tohoku Exhibition. The purpose of this document, which appears as DX 31 (with a translation in English as DX 33), was to provide information to sales and technical people both inside and outside of Fuji. This document was also marked B09–01, with the letter "B" meaning that Fuji personnel were free to show or give copies to customers. (D.I. 156, ¶ 28.)

On or before April 6, 1976, Okamoto had available to him approximately three hundred copies of this document. (D.I. 156, ¶ 29.) On April 7, he mailed 247 copies, 237 of which went to Fuji personnel. (*Id.*, ¶¶ 30–31.) The brochures were to be used in promoting the product as they saw fit, including distribution at the Third Tohoku Exhibition. Ten copies were sent directly to the manager of Horiuchi Shokai Company, an independent company engaged in the business of distributing refrigeration products. (*Id.*, ¶ 32.)[16]

Many copies of the offset-printed brochure were also distributed before and during the Third Tohoku Exhibition. For example, Mr. Takashi Takano testified during his deposition in Japan that he personally distributed about fifty copies prior to the conclusion of the Exhibition. (DX 275 at 5.) Copies were also distributed before, during, and shortly after the Exhibition by many others. (*See* Sekiya [about 40 copies] DX 281 at 3–4; Yasukochi [19 copies] DX 284 at 3–4; Nakajima [more than 2 copies] DX 286 at 3; Kobayashi [11 or 12 copies] DX 287 at 3–4; Miyamoto [4 copies] DX 290 at 3–4; Shimizu [4 or 5 copies] DX 285 at 4–5; Kawase [more than 10 copies] DX 286 at 3–4; Hamada [20 copies] DX 271 at 3–4.)

The Court finds from the clear and convincing evidence that the Aokage reverse air flow concept was widely and publicly disclosed by the large photoprint display and description display panels at the two Japanese trade shows in March and April

---

**15.** Such hand-printed documents qualify as "printed" since the Japanese language, unlike occidental languages, is characteristically handwritten due to its pictorial style and vast number of characters. *Minnesota Mining and Mfg. Co. v. Ansul Co.*, 213 U.S.P.Q. 1024, 1037 (E.D. Wis.1981).

**16.** The people to whom the copies were sent by Okamoto and the number of copies sent to each are identified in D.I. 156, ¶ 31.

1976. Furthermore, the disclosure was disseminated in the form of the hand-printed and offset-printed brochures. The Court must conclude from this evidence adduced and in the light of the applicable law discussed in this Court's prior opinion in this case, 553 F.Supp. 282–84, that the materials must be considered a printed publication within the meaning of 35 U.S.C. § 102(b). There is no question that the widespread disclosure of the Aokage air defrost concept to supermarket personnel, technical advisers and competitors was easily accessible and disseminated to those skilled in the art. Accordingly, because the Subera application for a U.S. patent on the same reverse flow air defrost was filed more than a year after that publication in Japan and was known by Tyler's Japanese joint venture personnel, the Subera patents are invalid by the bar of Section 102(b).[17]

## IV. VALIDITY OF AOKAGE PATENT

Tyler contends that Kysor is guilty of laches and estoppel and should not be permitted to enforce the Aokage patent against Tyler. (D.I. 302 at 48.) This contention is based on the argument that Kysor's patent attorney advised Tyler's attorney in 1978 that Tyler infringed the Aokage patent but then waited three years before it filed its specific counterclaim for infringement of the Aokage patent.

■ The facts adduced in evidence indicate, however, that Kysor acted promptly in putting Tyler on notice of its claim. Kysor's patent attorney wrote Tyler's attorney on May 25, 1978, advising him of the alleged Tyler infringement of the Aokage patent. (T. 171.) The attorneys met on July 27, 1978, to discuss the matter at which time Kysor was contending infringement of Aokage and Tyler was claiming noninfringement. Tyler filed this action on October 19, 1979 (D.I. 1) and less than a month later Kysor filed a counterclaim charging that the Subera patent was invalid. (D.I. 6.) Thus, Tyler was on notice

from the outset that Kysor contended that the Subera patent was invalid and since Kysor's attorney had previously indicated that both patented devices were identical, Tyler was placed on notice in 1979 of its own alleged infringement of the Aokage patent even though the amended counterclaim on this specific issue was not filed by Kysor until December 18, 1981. (D.I. 77.)

■ To gain the benefit of a laches defense in a patent infringement suit, the party asserting it must demonstrate its opponent's inexcusable delay in bringing its claim and establish material prejudice resulting from the delay; the mere passage of time does not constitute laches. *Maloney-Crawford Tank Corp. v. Rocky Mountain Natural Gas Co., Inc.*, 494 F.2d 401, 403 (10th Cir.1974); *Jenn-Air Corp. v. Penn Ventilator Co.*, 464 F.2d 48, 50 (3d Cir.1972). Likewise, to work estoppel in a patent suit, the party raising it must show, in addition to laches, that he was misled in some fashion by the opposing party. *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349–50 (6th Cir.1979); *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 479–80 (7th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975).

In this case, Tyler has done no more than make the bare assertions in its brief (D.I. 302 at 49) that Kysor delayed inexcusably and that Tyler relied upon that delay. No evidence was presented to support Tyler's argument that "Kysor acquiesced in the stated Tyler position" [of no infringement] or that Tyler in some way relied on Kysor's inaction. No prejudice was proved nor any misleading representation shown that would justify the application of the doctrine of laches or estoppel in this case.

Second, Tyler argues that the Aokage patent is invalid because it fails to disclose the best mode of invention as required by 35 U.S.C. § 112. This argument is based on the contention that the best mode of invention was "completely different from

---

**17.** Because the Court has found the Subera patents invalid for two distinct and independent grounds, it need not consider the other grounds

urged by Kysor for the unenforceability and invalidity of the Subera patents.

that illustrated in either the U.S. or Japanese Aokage et al applications" and was "more like the Fuji cases shown in the colored displays used at the March-April 1976 Japanese trade shows." (D.I. 302 at 51.)

■ This argument is missing the point. The inventions contained in the Aokage patent and disclosed at the Japanese trade shows are one and the same. While the diagram panels used in the trade shows included arrows illustrating in greater detail that the air curtain was maintained on defrost, Mr. Aokage testified that this was done to assist lay persons unskilled in the art to understand the concept:

Q. Is it necessary for those two arrows to be there for someone reasonably skilled in the art to understand what is being described?

A. It is not necessary for the people who are engaged in this industry, especially design engineer. However, it is necessary for the people like a store owner who is not involved in this industry.

Q. So, in other words, these middle two arrows on 67 would be helpful to somebody who was not familiar with the case and understanding how it might work?

A. Yes.

Q. But they were not necessary, in your judgment, for someone who is reasonably skilled in the art to understand the operation of the case?

A. Yes.

(Tr. 475–76.)

Tyler's further contention that the first embodiment of the Aokage patent is "of dubious commercial value" is also without merit. (D.I. 302 at 51.) Mr. Aokage testified that both embodiments had significant advantages, and that one advantage of the first embodiment was a shorter defrosting time:

Q. Is there a benefit to the first embodiment?

A. Yes, there is a benefit.

Q. What is that benefit?

A. In case of our first embodiment, you can get shorter defrosting time if you compare that with our second embodiment.

(Tr. 473.)

Tyler also argues that the inventors of the Aokage patent knew of the preferred embodiment through the test reports of December 18, 1975, and as of the March-April 1976 Japanese trade shows (T. 181; Tr. 517–19), and this knowledge shown in the trade show display panels was acquired prior to May 17, 1976, the date on which the U.S. Aokage application was filed. This argument, however, ignores the language of 35 U.S.C. § 119 which provides that the effective date of the later filed U.S. Aokage application is entitled to the May 17, 1975 filing date of the Aokage patent in Japan. Thus, in determining the best mode under Section 112 it is the knowledge held at and before that date and not at some later date. *See Standard Oil Co. v. Montedison, S.p.A.*, 494 F.Supp. 370, 387–88 (D.Del.1980), *aff'd*, 664 F.2d 356 (3d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

The Court finds no merit to Tyler's lack of "best mode" argument.

Finally, Tyler again argues that the Aokage patent does not teach that an air curtain is maintained while on defrost while the Subera patent does and based on this alleged distinction Tyler asserts that "Aokage conceals the real invention" (D.I. 302 at 53–54) in not incorporating the December 1975 Fuji test results and that the Aokage patent discloses "a different air defrost technique [than that] which Fuji and Kysor use in commercial practice." (*Id.* at 55.) Tyler maintains this constitutes fraud on the patent office and non-compliance with Section 112. Tyler's argument, however, is contrary to the Court's findings in the early part of this opinion and therefore is based on an erroneous foundation. This Court has held that Fuji obtained protection of its U.S. patent for the same reverse flow air defrost invention disclosed in its Japanese patent and further disclosed to

the public at the Japanese trade shows and in the brochures used in connection therewith. The Court has already found that the language of the Aokage patent does not teach that an air curtain is not maintained on defrost and in any event the air curtain in the Aokage patent is an inherent function. The Court finds these final arguments of Tyler to be without merit.

Accordingly, the Court finds the Aokage patent to be valid.

## V. INFRINGEMENT

The Court having found and concluded that the Kysor Aokage patent is valid and that the Tyler Subera patents are invalid, the question becomes whether the Tyler display cases infringe the Aokage patent. The parties agree there is but a single invention in issue in this suit. (D.I. 290, III, ¶ 7.) The invention is set forth in the description of the second embodiment of the valid Aokage patent and claims 3 and 6 directed to that embodiment. (DX 1.) The invention, as this Court has found, is also embodied in the Tyler representative display case model D6F (*id.*, ¶ 9) which is the subject of the specifications and claims 35 and 36 of the Subera '720 patent, claims 1–3 of the Subera '747 patent, and claims 1–12 of the Subera '922 patent (*id.*, ¶ 4) and which the Court has found all to be invalid.

Because this Court has already found that the inventions set forth in the pertinent claims of the Aokage and Subera patents perform the same function and are indistinguishable, it follows that Tyler's display cases based on the invalid Subera patents infringe the claims of the valid Aokage patent.

Tyler points out that claims 3 and 6 of the Aokage patent, in part, read when operating on defrost as follows:

Operating said second air circulation means in the direction reverse to that in normal cooling operations thereby to cause a portion of air in said second passage to flow out of said suction inlet thereof and be immediately sucked in short-circuited flow into a suction inlet of said first passage and portions of air in said first and third passages to flow out of respective ejection nozzles thereof and be immediately sucked in short-circuited flow into said ejection nozzle of said second passage and thereby draw warm outside air into said passages to accomplish defrosting.

(DX 1, Column 6, Lines 8–18.)

Tyler, relying upon Mr. Ibrahim's testimony and the videotaped film ordered by Mr. Ibrahim, argues that there is no short-circuiting from the primary band to the middle band in the Tyler cases (Tr. 111; T. 72) and for this reason the Tyler air defrost technique is totally different from the Aokage concept and of course there could be no infringement.

Ibrahim did testify that there was no short-circuiting in the Tyler display case on direct examination (Tr. 111), but he did relent on cross examination and stated that short-circuiting of approximately 5% of the air injected from the refrigeration nozzles did occur during defrost of the Tyler cases. (Tr. 177.) Furthermore, Tyler's videotape of the test run (viewed by the Court) did reveal noticeably short-circuiting. (T. 72.)

Dr. Sterling Beckwith, a person skilled in the art, examined the air flow during defrost of some of Tyler's display cases by conducting smoke tests. (Tr. 588–89.) He explained that making smoke tests, it is important to make such tests in front of the shelves as well as at the nozzles (Tr. 593) as he did in his lengthy inspection of the Tyler cases. (Tr. 586.) In making these tests, he concluded that some of the air flowing down out of the refrigeration nozzles was sucked up into the guard nozzles. Although the exact amount is difficult to measure, Dr. Beckwith estimated that somewhere between 20 and 40 percent was short-circuited. (Tr. 581.) He has also reviewed the films Tyler made of its case, as well as the videotape Tyler made from that film (Tr. 582), and he observed short-circuiting and explained the general nature of the flow action. (Tr. 582–83; T. 72.)

Based on the credible testimony and evidence, the Court is convinced that the so-

called "short-circuiting" distinction asserted by Tyler does not exist. Accordingly, the Court finds that Kysor has borne its burden of proving that the Tyler display cases offered for sale (DX 244) infringe the patent claims of the Aokage patent.

## VI. INCREASED DAMAGES AND EXCEPTIONAL CASE

Kysor in its main brief has requested the Court to find (1) that Tyler wilfully infringed the Aokage patent which would permit the Court in its discretion to "increase damages up to three times the amount found or assessed" in accordance with 35 U.S.C. § 284, and (2) that this suit be determined to be an "exceptional case" under 35 U.S.C. § 285 entitling Kysor to an award of attorneys' fees. (D.I. 304 at 82–89.) Tyler in its briefs did not respond to these suggestions.

In this litigation the issue of damages was bifurcated from the trial on the issues of patent validity and infringement. (D.I. 290, III, ¶ 46.) While at this stage the Court could make an immediate finding whether or not the infringement of the Aokage patent was wilful or that this case was exceptional, any assessment of increased damages or any award of attorney fees would have to await until the conclusion of the damage phase of the trial. *Lang v. Prescon Corp.*, 545 F.Supp. 933, 949 (D.Del.1982); *General Battery Corp. v. Gould, Inc.*, 545 F.Supp. 731, 762 (D.Del. 1982). The Court, nevertheless, is of the opinion that any finding of wilfulness in order to enhance damages and any finding that this is an exceptional case should await until the damage phase of this case has been completed. *E–I–M Company v. Philadelphia Gear Works*, 223 F.2d 36, 42 (5th Cir.1955); *Pyle National Co. v. Lewin*, 92 F.2d 628, 631–32 (7th Cir.1937); *Anchor Hocking Glass Corp. v. White Cap Co.*, 47 F.Supp. 451, 453 (D.Del.1942). The Court exercises its discretion in this regard for several reasons. First, the Court desires to consider the evidence of the full nature and extent of infringement before determining wilfulness. Second, the Court desires to give the parties an opportunity

to agree, if possible, on the amount and type of damages before the damage trial phase. Finally, the Court having found the Aokage patent valid, the Subera patents invalid, and the Aokage patent infringed, it has refrained from passing on Kysor's claims that the Subera patents are also unenforceable because of alleged fraud practiced on the PTO. Accordingly, the Court declines at this stage to make a finding of wilful infringement or that the case is exceptional and therefore postpones these findings until the conclusion of the damage trial, if the case is not otherwise resolved before that time.

Judgment will be entered in accordance with this opinion.