39 C.C.P.A.(Patents)

## LEARNED v. THOMPSON.

### Patent Appeals No. 5803.

United States Court of Customs and
Patent Appeals.

June 29, 1951.

Rehearing Denied Sept. 28, 1951.

H. L. Godfrey, Washington, D. C., for appellant.

D. Gordon Angus, Pasadena, Cal. (Richard L. Underwood, Washington, D. C., of counsel), for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

WORLEY, Judge.

This is an appeal in an interference proceeding from a decision of the Board of Interference Examiners of the United States Patent Office, one member dissenting, awarding to appellee priority of invention of the subject matter contained in four counts.

The interference involves the application of appellant, serial No. 535,107, filed May 11, 1944 and the application of appellee serial No. 531,564, filed April 18, 1944. The instant interference is a consolidation of Interference Nos. 82,373 and 83,032. Interference No. 82,373 was declared March 21, 1946, between the application of Thompson (appellee), and applications of three other parties; namely, Richard S. Hunter, Larry L. Young, and Charles H. Learned (appellant). Interference No. 83,032 was declared October 2, 1947, between the applications of Thompson, Hunter, and Learned on counts added during the motion period of the first interference No. 82,373.

It appears that judgment below was entered against Young and that Hunter filed an abandonment of the contest, thus leaving only Learned and Thompson as parties here involved.

Count 1 is representative of the counts in issue and reads as follows: "1. A signalling device designed for free manipulation with reference to a moving target, comprising, a mirror adapted to receive and project light from a distant source toward the target and provided with a window, a retro-directive reflector adjacent to the window and means whereby light received by said retro-directive reflector is returned to the window and reflected in a direction nearly opposite to the light projected by the mirror on a line nearly coinciding in direction with light reaching the eye from a target in the path of the light projected by the mirror so that the operator views simultaneously and superimposed, both a dim virtual image of the distant source and the target upon which the principal beam of the mirror is projected."

Both parties took extensive testimony, filed briefs, and were represented at the final hearing.

Appellant, Learned, being the junior party, has the burden of proving priority of invention by a preponderance of the evidence.

The invention was described by the Board of Interference Examiners as follows: " * * * a signal device which enables a person to aim a reflector so that the reflected light will strike a desired target. The device consists essentially of a silvered mirror having a sight opening therein and a retro-directive reflector positioned in the vicinity of said opening, whereby the operator may sight through the window in the reflector at the object onto which it is desired to flash the signal and at the same time view the virtual image of the sun as formed by the retrodirective reflector. When the virtual image of the sun is superimposed upon the target the user is assured that the reflected light from the sun will be falling upon the target seen."

We think it appropriate to briefly state the background, facts, and contentions of the respective parties before making a detailed analysis thereof.

It seems that Learned conceived the involved invention in 1933 but failed to reduce it to practice. In March of 1943 he wrote a letter to the National Inventors Council, a duly constituted government agency, in which he described his invention and offered it to the Government. In June of 1943, the Government replied with a "noncommittal" answer, but placed the Learned disclosure in its classified files. However, on January 11, 1944, the National Inventors Council turned the Learned disclosure over to one Hunter, employed in the Bureau of Standards, who successfully reduced it to practice by tests con-

ducted at the United States Naval Air Station at Pensacola, Florida, February 7, 1944. It also appears that in the month of January 1944, the National Inventors Council wrote Learned, asking him to state his attitude toward making his disclosure available to the Government. Learned testified that in his reply he stated that he wanted it to be "freely available to the United States for what use they might make of it." Learned contends these actions created such a relationship between himself and the Government as to give him the benefit of the reduction to practice made by Hunter on February 7, 1944. It is to be noted that Learned made application for his patent on May 11, 1944, whereas Thompson filed his application for a patent on April 18, 1944. Thompson argues that no relationship existed between Learned and the Government sufficient to justify Hunter's activities inuring to Learned's benefit. With respect to Thompson, the board found that he established conception of his invention on November 21, 1943, by virtue of a letter he sent on that date to one Colonel Shore of the Office of Strategic Services, also a government agency in Washington, D. C. However, the board held his activities in reducing his invention to practice were not sufficiently corroborated and restricted his date of reduction to practice to his filing date of April 18, 1944.

The principal question before us is whether any relationship existed between Learned and the Government to justify our holding that Hunter's activities inured to the benefit of Learned. If such be the case, then award of priority should go to Learned.

The board found that Learned's letter of March 21, 1943 (Learned's Exhibit 10), "completely describes the invention in issue and contains three diagrams showing different modifications of the mirror and sighting device. There is no question but what Exhibit 10 constitutes a full and complete description supporting all of the counts in issue."

With respect to events subsequent to the date of that exhibit, the following testimony appears as elicited under cross-examination of appellant by counsel for appellee:

"X-Q. 128. Did you receive any reply to this letter, Exhibit 10? A. Yes, I received an acknowledgment from the Bureau of Standards—no, from the National Inventors' Council.

"X-Q. 129. You haven't produced that reply here today, though, have you. A. It has not been produced. Mr. Godfrey [counsel for appellant] has the original.

"X-Q. 130. The one that you received from the National Inventors' Council? A. Yes.

"X-Q. 131. What did the National Inventors' Council tell you in that reply? A. They stated that my device had been examined and found interesting but that *in their view, it showed no sufficient improvement over devices then developed to warrant the development of my device.* They thanked me for my interest shown and invited me to submit any further ideas. (Italics supplied.)

"X-Q. 132. Did the National Inventors' Council then drop your idea?

"Mr. Godfrey: I will object to that as outside the scope of the direct examination. This witness cannot say what the National Inventors' Council did. That matter will be brought out in Washington.

"Mr. Angus: Well the witness can say whether the National Inventors' Council did anything further. I will rephrase the question.

"By Mr. Angus:

"X-Q. 133. Subsequent to your receipt of the letter to which you just referred from the National Inventors' Council, did the National Inventors' Council go any further with your idea with you? A. *In January of 1944, I received a letter stating that it had been deemed advisable to develop my invention, because it showed advantages over the systems that had been previously developed.* (Italics supplied.)

"X-Q. 134. Then you did nothing about your invention between March of 1943, the date of Exhibit 10, and January

of 1944, did you, when you received that reply from the Inventors' Council? A. No, I had no facilities nor time available. That was the period of the war effort. I was very busy earning a living.

"X-Q. 135. Now when did you receive the reply from the National Inventors' Council to the effect that they did not wish to use your invention, as they had other devices? A. The first reply was in June of 1943.

"X-Q. 136. And that was the reply in which they said they did not want to use your invention? A. *I believe the reply stated that there seemed to be no advantage in further development at this time.* (Italics supplied.)

"X-Q. 137. Then you heard nothing further until January, 1944, did you? A. That's correct.

"X-Q. 138. After you received that second letter from the National Inventors' Council in January, 1944, what did you then do with reference to your invention? A. *They asked me to state my attitude toward making it available to the Government, and whether I would object to having the device disclosed in government publications, and some other questions. I don't remember; it was rather a lengthy letter. I sent them a statement indicating what I considered my invention to be and stating that I wanted it to be freely available to the United States for what use they might make of it.* (Italics supplied.)

"X-Q. 139. When did you send that last letter to which you have just referred?

"Mr. Godfrey: I will object and move to strike all testimony as beyond the scope of the direct examination—all testimony of this character.

"Mr. Angus: It has to do with the reduction to practice of the invention referred to in the Los Angeles testimony a few days ago. And I think the witness should answer the question.

"Mr. Godfrey: What is the question? Do you have the question? Will you read it back, please? (Record read.)

"A. *I don't remember the date of it; it was either late in January or early in the*

*month of February, 1944.* (Italics supplied.)

"X-Q. 140. To whom was it addressed? A. To the National Inventors' Council.

"X-Q. 141. You never sent the National Inventors' Council any physical embodiment of your invention, did you? A. No, I offered to send them in my first letter and no request was ever made.

"X-Q. 142. And you never sent them any, did you?

"Mr. Godfrey: What do you mean, 'any'?

"By Mr. Angus:

"X-Q. 142. Any physical embodiment of the mirror and the retro-directive reflector device testified to by the witness this morning.

"A. No.

"X-Q. 143. Do you know Mr. Hunter, in the Bureau of Standards? A. Only through correspondence.

"X-Q. 144. When did you start your correspondence with Mr. Hunter?

"Mr. Godfrey: Again the question is objected to as outside the scope of the direct examination.

"A. I can't remember the details. There were so many letters sent that I can't remember them individually. I would have to look at my correspondence to answer that.

"X-Q. 145. Was it after February, 1944? A. I believe it was.

"X-Q. 146. Was it after your correspondence with the National Inventors' Council? A. Yes.

"X-Q. 147. How did you happen to start correspondence with Mr. Hunter? A. I can't recall off-hand just what it was, but I believe the first correspondence I received from Mr. Hunter was a copy of his report of tests for types of rescue mirrors. *I have the letter in my automobile, in case you would like to have it produced later.* (Italics supplied.)"

Also on this point, one Hicks, at that time an employee of the National Inventors

Council testified as follows in response to counsel for appellee:

"X-Q. 52. Did you write Mr. Learned a letter in response to that letter, Exhibit 10? A. Yes.

"X-Q. 53. And in that letter you wrote to him, you turned his device down, did you not? A. No; *we didn't turn it down. We just told him that there were other devices at that time simpler. I don't remember the exact wording.* (Italics supplied.)

"X-Q. 54. Did you not indicate to him that you did not propose to use his device? A. No.

"X-Q. 55. Do you have a copy of the letter which you wrote to Mr. Learned? A. I imagine it is in the file. I don't have one personally.

"X-Q. 56. Well, it was a letter giving him no encouragement, was it not?

"Mr. Godfrey: I object.

"A. *I wouldn't say that. You see, these were form letters, and we had a definite turndown letter, and one just sort of noncommittal.* You couldn't promise a man something until you found it could do something. We wrote some letters, due to classification in the armed services, *we didn't want to let the person know what was going on at that time—just noncommittal.* (Italics supplied.)

"X-Q. 57. *You did not tell him you were going to use his device, then, did you?* A. *No.* (Italics supplied.)

"X-Q. 58. Did you receive any samples from him of mirrors? A. Not at that time.

The board noted that the correspondence which Learned testified he had with the National Inventors Council and with Mr. Hunter of the Bureau of Standards was not introduced in evidence. The board was of opinion that those communications had a material bearing on the questions involved and should have been introduced in evidence and that the failure to introduce such correspondence, although not done with fraudulent intent nor to suppress evidence, hampered them considerably in their consideration of the case. They further ob-

served, " * * * however, in accordance with well established legal practice it can only be taken as a tacit admission that the contents thereof would have been adverse to Learned."

▆ We are in agreement with that statement as a general rule of law. We feel, however, that the board did not properly apply that principle to the facts at hand. It seems the board carried that presumption to an extent not warranted by the facts here involved. We think the rule is properly stated in Jones on Evidence, Fourth Edition, Vol. 1, sec. 19, page 49: "Sec. 19. *Withholding evidence.*—There is a recognized legal presumption that a party will produce evidence which is favorable to him if such evidence exists and is available. And the mere withholding or failing to produce material evidence which is available and would, *in the circumstances of the case,* be expected to be produced, gives rise to a natural inference—less forceful than that arising from the destruction, fabrication or suppression of evidence in which other parties have a legal interest but constantly acted upon by the courts—*that such evidence is held back* because it would be unfavorable or adverse to the party withholding it. (Italics supplied.)" Also the rule relative to the "Failure to Produce Most Satisfactory Evidence" is stated in 22 C.J. § 55, page 115; 31 C.J.S., Evidence, § 156, p. 850: "Where it is apparent that a party has the power to produce evidence of a more explicit, direct, and satisfactory character than that which he does introduce and relies on, it may be presumed that if the more satisfactory evidence had been given it would have been detrimental to him and would have laid open deficiencies in, and objections to, his case which the more obscure and uncertain evidence did not disclose."

It seems to us that the crux of this case rests upon the weight to be given the testimony of Learned in answer to the questions asked him on cross-examination by counsel for appellee relative to the contents of the written documents which were obviously available. We think the board erred in not giving sufficient weight

to the testimony of Learned inasmuch as it was given in response to questions by counsel for Thompson who did not demand the production of the letters referred to. It will be noted that counsel for Learned objected to all testimony relative to the letters exchanged between Learned and the National Inventors Council as being beyond the scope of the direct examination. From our evaluation of the direct examination, it is debatable whether counsel for appellee actually went beyond the scope of the direct examination, thereby making Learned his witness and becoming bound by his testimony. Assuming, however, that counsel for appellee did not go beyond the scope of the direct examination, he was still responsible for bringing the testimony of Learned into the record as evidence to be considered. If counsel for appellee was not satisfied with Learned's testimony, he could have demanded production of the actual correspondence itself as the best evidence. Certainly appellant held back no evidence. He made it clear in his testimony where the correspondence was and we assume it would have been produced if counsel for appellee had asked for it. For example, in one instance Learned testified as follows:

"X-Q. 128. Did you receive any reply to this letter, Exhibit 10? A. Yes, I received an acknowledgment from the Bureau of Standards—no, from the National Inventors' Council.

"X-Q. 129. *You haven't produced that reply here today, though, have you?* A. *It has not been produced.* Mr. Godfrey [counsel for appellant] *has the original.* (Italics supplied.)"

In another instance it is noted:

"X-Q. 168. *Do you have any documents by which you could refresh your recollection as to the date when you first heard from Mr. Hunter? A. Yes, I have my correspondence in my automobile at a parking lot across the street.* (Italics supplied.)"

█ Clearly the documents referred to were available to counsel for appellee. Therefore, he may not now complain concerning their absence from the record. Apparently counsel for appellee was satisfied with the evidence as to the contents of the missing correspondence which was given by Learned during his cross-examination. Counsel for appellee, in his brief, states that "* * * Although the cross-examination developed that there was more correspondence between Learned and the Government in 1944, Learned declined to put any of this in evidence even though he testified that he had a letter in his car across the street at the time of taking testimony."

In view of the above instances, together with the testimony of the entire record, we do not believe such statement to be accurate.

The question of whether a quasi agency, or any relationship at all actually existed between Learned and the Government can be determined only by an examination of the available exhibits and testimony. For the reasons stated above, we feel constrained to treat the uncontroverted testimony of Learned as truthful and valid.

In summary, taking the steps in chronological order, the first action was taken by Learned in his letter of disclosure to the National Inventors Council on March 21, 1943 in which he said "I am willing to waive my patent rights or give a public patent on my invention of the heliograph sight." To us this was clearly an offer on the part of Learned for the Government to take and use his discovery. Then came the answer from the National Inventors Council to Learned, as testified to by the witness Hicks, which was received sometime in June of that year but was of a "noncommittal" nature, although the National Inventors Council placed the Learned disclosure in its classified files. Then, on January 11, 1944, the National Inventors Council, apparently believing Learned's disclosure to be meritorious, delivered it to Hunter in the Bureau of Standards. The record shows that Hunter immediately began work on the Learned disclosure and that by February 7, 1944, had successfully reduced it to practice by actual tests

on airplanes and life rafts at the Naval Air Training Station, Pensacola, Florida.

Learned testified that in the same month of January 1944, the Government wrote him a letter inquiring his attitude toward making his invention available to the Government. We believe it of interest to quote from the opinion of the board on this point:

"It seems to us that, as far as Learned is concerned, whatever agency relationship had been established between himself and the National Inventors' Council, was terminated in his own mind at this time. In view of Learned's recollection of the second letter he received from the National Inventors' Council in January, 1944, in which he said they asked him to state his attitude toward making his idea available to the Government * * *, it would seem that the National Inventors' Council had also considered the relationship offered in his first letter as terminated, and by this letter of January, 1944, they sought to reestablish the relationship, whatever it may have been. *Here again, however, we are handicapped by the absence of the letter itself, which, of course, is material and which apparently was available.*

"It is true that Learned has testified that in response to this letter he stated that he wanted to make his invention freely available to the United States. However, this again, is testimony setting forth the contents of an available written document and given long after the event. *This self-serving declaration is of little or no probative value.* Thus, it seems to us that there is nothing in the record which clearly establishes that the relationship between Learned and the National Inventors' Council had been reestablished, at least to such an extent that whatever the Government may have done in the line of testing the device would have inured to Learned's benefit. (Italics supplied.)"

■ It is obvious to us that the board gave no weight whatever to that testimony by Learned, treating it as self-serving and of little or no probative value. Again

we say that under the circumstances of this case, the best evidence was available and could have been demanded by counsel for appellee who was responsible for bringing the matter into the record. When he failed to do so, however, the testimony of Learned, in the absence of fraud or better evidence, is the best evidence available and is entitled to full weight.

■ If, in the circumstances here, we are to give Learned's testimony the weight to which we feel it is entitled, we are constrained to conclude that the letter from the Government to Learned in January 1944, inquiring Learned's attitude toward making his invention available to the Government, and Learned's testimony that he wanted it to be freely available to the Government, constituted a relationship sufficient to enable Learned to benefit from Hunter's reduction to practice. Although the board seemed to treat Learned's testimony of his willingness to make his invention available as of no probative value at all, we find no evidence in the record to dispute Learned's testimony. There is no evidence to show that Learned ever considered his authorization to the Government withdrawn even after the noncommittal reply to his original letter of March 21, 1943. We find nothing in the record to indicate that Learned had changed his desire to make his device freely available to the Government.

We conclude, therefore, that an agency relationship was established between the Government and Learned at least as early as January 1944.

The next question is whether, in view of such relationship, Hunter's activities inured to Learned's benefit. Of course, Hunter was an employee of the Government, as were the pilots of the airplanes and the other personnel engaged in the tests at Pensacola.

The board held that Hunter was not working on Learned's device but was working on an improvement of the device disclosed by Learned. It is to be noted, however, that Hunter consistently re-

ferred to the device which he made from the Learned disclosure as the "Learned type mirror," which was an obvious reference to the Learned disclosure. On that point, the following is quoted from the decision of the board: "We are of the opinion that the testimony which has been presented relative to the Pensacola tests convincingly establishes that the device was satisfactory for its intended purpose, and, therefore, that the invention in issue was fully reduced to practice at that time, i. e. February 7, 1944."

It should be noted at this point that Hunter, apparently without the knowledge of Learned, filed a patent application on July 14, 1944, which he assigned to the Government. The board found that his claims were not broad enough to read on Learned's disclosure but that "For the most part the claims were limited to the inclined relation of the reflector to the mirror and some included the limitation that the reflector was made of colored glass to thereby dim the image of the sun."

█ It seems that although Hunter originally believed himself to be the inventor of certain of the involved subject matter; viz. (1) the dimming feature and (2) placing the reflecting material at an angle to the mirror, he later discovered that the former was disclosed by Learned and apparently concluded that the latter was not patentable over the Learned disclosure. In any event, he abandoned his application in favor of Learned.

Counsel for appellee, in his brief, alleges error on the part of the board in holding that appellee had not reduced his invention to practice prior to the filing date of April 18, 1944. It seems to us that the same standard for reduction to practice which the board applied with respect to Learned's tests in 1933 and the tests by Thompson in 1943, was the correct legal standard and that those activities could not be said to constitute proper reduction to practice prior to the dates found by the board.

For the reasons stated, we feel the decision of the majority of the Board of Interference Examiners should be reversed and that priority of invention should be awarded to appellant Learned.

Reversed.